UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID PIELA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:10cv749 (MRK) |
| | : | |
| STATE OF CONNECTICUT | : | |
| DEPARTMENT OF CORRECTION and | : | |
| CHRISTINE WHIDDEN, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION**

Plaintiff David Piela brings suit against the Connecticut Department of Correction ("DoC") and Warden Christine Whidden (collectively "Defendants") alleging that he suffered discrimination, harassment, and a hostile work environment as a result of his sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution as enforced through 42 U.S.C. §§ 1983, 1988; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq*. *See* Compl. [doc. # 1].

Mr. Piela's allegations are based largely on hearsay, which the Court may not credit at the summary judgment stage.[1] *See, e.g.*, *Estate of Hamilton v. City of New York*, 627 F.3d 50, 54 (2d Cir. 2010) (noting that a statement was "rightly excluded from evidence" at the summary judgment stage, as it was not subject to any hearsay exception); *Lawrence v. Mehlman*, 389

---

[1] At oral argument, the parties agreed that the Court may not consider hearsay evidence in deciding a motion for summary judgment. The Court gave Mr. Piela's counsel the opportunity to provide affidavits from the individuals who allegedly made certain statements or, alternatively, to brief the question of whether the statements might be allowable under an exception to the hearsay rules. Mr. Piela's counsel declined both offers.

1

F. App'x 54, 56 n.2 (2d Cir. 2010) (citing Rule 56(e)(1) and Rule 802 of the *Federal Rules of Civil Procedure* for the assertion that plaintiff's hearsay account was not admissible into evidence at the summary judgment stage); *Feingold v. New York*, 366 F.3d 138, 155 n.17 (2d Cir. 2004) ("In reviewing the district court's grant of summary judgment, . . . we may only consider admissible testimony."). Once such statements are eliminated, the remainder of Mr. Piela's evidence would permit a reasonable juror to conclude that his superior, Warden Whidden, may have treated him poorly—but no reasonable juror could conclude that her actions were motivated by his sex. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment [doc. # 43].

**I.**

The following admissible facts are culled from the parties' Local Rule 56(a) Statements [docs. # 43-2, 46-1], affidavits, and exhibits. All of the facts recited below are undisputed unless otherwise noted, and the Court presents all facts "in the light most favorable to the nonmoving party"—here, Mr. Piela—after drawing "all reasonable inferences in [his] favor." *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000) (quotation marks omitted). Additional facts are discussed in the analysis where relevant.

Mr. Piela began his employment with the DoC in August 1996 as a Correction Officer. In April 2006, then-Lieutenant Piela transferred to the Manson Youth Institution, where Christine Whidden was warden. Mr. Piela's direct supervisors between April 2006 and January 2009 were three males: Captain Chris Taylor, followed by Captain Phil Costanzo, who was followed in turn by Captain Jeffery Saucier. In the spring of 2008, when the majority of the alleged discriminatory treatment occurred, Mr. Piela's direct supervisor was Captain Saucier. During this time period, Lieutenants Jennifer Fietel and Kim Lauray—both women—also worked at DoC.

In addition to his work at the Manson Youth Institution, Mr. Piela was also a member of the South District Correctional Emergency Response Team ("CERT"), one of several emergency response groups within the Tactical Operations and Correctional Transportation Unit (the "Tactical Operations Unit"). CERT responds to emergencies within facilities to restore normal operations. Pursuant to its written policy, the Tactical Operations Unit does not permit its members to be active participants on CERT if there is an investigation pending regarding that individual.

Mr. Piela filed a complaint with the CHRO on December 5, 2008, alleging that he was subjected to discrimination and harassment because of his sex. Mr. Piela left DoC on worker's compensation on January 29, 2009 and took disability retirement on August 1, 2010.

The following subsections describe the facts which Mr. Piela alleges evidence discriminatory treatment.

A.

While Warden Whidden was making her rounds, an inmate with wounds on his face reported that he had been assaulted by Mr. Piela. As she was obligated to do, Warden Whidden opened an investigation regarding this alleged incident on March 7, 2008.

On April 7, 2008, Richard Miele, the director of the Tactical Operations Unit at that time, suspended Mr. Piela after Warden Whidden informed the director of Mr. Piela's pending investigation. Captain Joseph Carlone stated in his affidavit that it is agency policy for wardens to inform the directors of the Tactical Operations Unit of investigations, arrests, or criminal cases involving CERT members. While Mr. Piela acknowledges that Warden Whidden does not have any role in CERT and that wardens generally do not decide who is suspended from CERT, he maintains that Warden Whidden decided to open an investigation regarding the inmate's

3

complaint and to inform Mr. Miele of that investigation knowing that it would result in his suspension.

On April 7 or 8, 2008, Captain Brian Evelich submitted his report on the investigation to Warden Whidden. Mr. Piela maintains that this report exonerated him of any wrongdoing.

On May 8, 2008, Mr. Piela was arrested for driving under the influence, operating a vehicle without headlights, and interfering with an officer/resisting arrest. On May 28, 2008, Mr. Piela was informed that his CERT suspension would continue because of this arrest.

There is no formal DoC policy dictating when an investigation must be closed. Mr. Piela stated at his deposition that he petitioned people within his chain of command on six separate occasions for resolution of the excessive force investigation with no result until the investigation was closed on November 6, 2008. Neither side offers any evidence as to why the investigation was closed when it was or if Warden Whidden relied on anything other than the April 2008 report in deciding to close the investigation.

Mr. Piela also alleges that, when Lieutenant Feital was under investigation, Warden Whidden did not contact CERT to inform them of the lieutenant's status, but he does not provide any evidence as to when the investigation against Lieutenant Feital commenced. The parties agree that, on October 1, 2008, Lieutenant Feitel was suspended from CERT because she was involved in a pending Security Division investigation. Warden Whidden issued Lieutenant Feitel a letter of formal counseling, dated October 31, 2008, for failure to follow proper procedures when she gained access to a confidential videotape. Mr. Piela also believes that this letter was not commensurate with Lietutenant Feitel's offense and that she should have received a more severe punishment.

Warden Whidden refused to meet with Mr. Piela from March through November 2008,

while the excessive force investigation was pending. Mr. Piela acknowledges that Warden Whidden had a policy of not meeting with individuals while an investigation was open, and that she did not meet with Lieutenant Feitel while she was under investigation.

B.

In November 2007, Mr. Piela applied for a Training Lieutenant position at the Maloney Center for Training and Staff Development. According to Mr. Piela, the posting for the position noted that experience would be heavily weighted when candidates were evaluated. Panel interviews were held in January 2008 with the expectation that the selected candidate would start work on February 15, 2008.

Sandra Sawicki, the Director of the Maloney Center, submitted an affidavit stating that the open position was offered first to Lieutenant Feital because she was the panel's first recommendation; it was offered second to Lieutenant Lauray because she was the panel's second recommendation; and that Mr. Piela was not selected for the position because he did not do well in the interview. Mr. Piela alleges that Lieutenant Lauray accepted the position.

Mr. Piela acknowledges that Warden Whidden was not a decision-maker and did not sit on the interview panel, but he maintains that she made negative comments about him to Director Sawicki and that these statements resulted in his not being offered the position. In response to Mr. Piela's hearsay evidence, Director Sawicki denies having any conversation with Warden Whidden where the latter stated that Mr. Piela was a womanizer or could not be trusted.

Mr. Piela also notes in his deposition that, while he had eleven years of training experience, Lieutentant Feital had very little training experience and that he believed Lieutenant Lauray had significantly less training experience than he did. Neither party offers additional evidence regarding the respective training experience of the applicants.

C.

Mr. Piela alleges that, while Warden Whidden had submitted the necessary evaluations for all other applicants for a promotional opportunity in November 2008, she did not submit a similar evaluation for him until December 2008.

On December 10, 2008, Captain Saucier completed Mr. Piela's Correctional Captain Promotional Facility Evaluation, which he then provided to Warden Whidden. After reviewing the evaluation, Warden Whidden changed the evaluation to increase Mr. Piela's ranking in one category from "Development Opportunity" to "Proficiency." On December 10, 2008, Warden Whidden signed the evaluation and forwarded it to Human Resources as part of Mr. Piela's Correctional Captain application. The candidates' applications were not reviewed until February 18, 2009. Due to the hiring freeze then in place, no promotions were made until August 14, 2009. As Mr. Piela was no longer working at that time, he was not selected for promotion.

In his deposition, Mr. Piela acknowledged that he did not know when Captain Saucier had given his evaluation input to Warden Whidden and that he was not claiming that the allegedly late evaluation prevented him from being promoted to Captain.

D.

In the spring of 2008, Director of Security Michael Lajoie contacted Warden Whidden to see if it would be feasible to temporarily reassign Mr. Piela to assist in the Security Division. Warden Whidden told Director Lajoie that the Manson Youth Institution was already short on lieutenants and that she could not approve the temporary reassignment due to the staffing levels. Warden Whidden states in her affidavit that she informed Director Lajoie that Mr. Piela had recently been the subject of an excessive force investigation; Director Lajoie states in his affidavit that the warden informed him both of the investigation and of Mr. Piela's pending arrest. Mr. Piela acknowledges that Director Lajoie made the decision not to temporarily reassign

him, but he maintains that the Director would not have made that decision but for Warden Whidden's statements. The parties agree that the temporary reassignment was not a promotional opportunity.

E.

Training regulations provide that appointment as a trainer shall be based on the employee's maturity, employment history, good judgment, reliability, initiative, an ability to support the unit's mission. The regulations further state that training candidates shall be discipline-free for the 12-month period preceding training and shall remain discipline-free while conducting training. Director Sawicki stated in her affidavit that she had a policy of not allowing employees to act as trainers when they had pending arrests or open investigations.

In September 2008, Mr. Piela began conducting a six-day-long New Supervisor's Orientation training. When Warden Whidden learned of the training, she informed Director Sawicki that Mr. Piela had an arrest pending. Two days into the training, Mr. Piela was pulled from conducting it. Mr. Piela alleges that Lieutenant Feital was allowed to conduct trainings while she was the subject of an open investigation, but he offers no evidence in support of this claim.

F.

Mr. Piela makes a number of additional allegations in support of his claims, which the Court consolidates in this subsection.

First, the parties agree that, in 2006, Warden Whidden told Captain Costanzo that she wanted Mr. Piela to shave his beard. Mr. Piela notes that his beard was permitted under departmental regulations and alleges that Warden Whidden knew of and permitted Lieutenant Feitel to wear a tongue ring, which was prohibited by the same regulations.

Second, Warden Whidden habitually referred to Mr. Piela as "young man" in front of co-workers, despite his requesting that she not do so. Mr. Piela does not recall having heard her call anyone else "young man."

Third, administrative regulations require employees who are romantically involved with other employees to report that relationship. When Warden Whidden heard that Mr. Piela was having an affair with another employee, she reported that information to Mr. Piela's direct supervisor, Captain Saucier. Captain Saucier said that he had not heard about the affair, and after the two discussed what Warden Whidden had heard, no further action was taken.

Finally, Mr. Piela alleges that he complained of Warden Whidden's actions to her immediate supervisor, District Administrator Mark Strange. On October 7, 2008, Mr. Strange met with Warden Whidden and Mr. Piela, at which meeting Mr. Strange informed Mr. Piela that he could file a complaint against Warden Whidden if he so chose. However, Mr. Piela maintains that Mr. Strange strongly implied that he should not do so. Mr. Piela never filed a complaint within the agency regarding Warden Whidden. The parties agree that, at that meeting, Warden Whidden did not admit that she had harassed Mr. Piela or that she had called him "a fucking piece of shit liar."

## II.

This Court applies a familiar standard when resolving a motion for summary judgment. Summary judgment is appropriate only when the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" submitted to the Court "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A); Fed. R. Civ. P. 56(a). A "material fact"

is one whose resolution will affect the ultimate determination of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See id.*; *see also Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006). As noted above, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Sologub*, 202 F.3d at 178 (quotation marks omitted). However, the party against whom summary judgment is sought cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts," but instead "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986) (quotation marks omitted) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The Second Circuit has cautioned that district courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and quotation marks omitted). In a summary judgment evaluation, a plaintiff's deposition testimony based on personal knowledge "must be credited." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 549, 555 (2d Cir. 2010).

However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*,

9

118 F.3d at 110. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (quotation marks omitted).

### III.

All of Mr. Piela's discrimination claims based on adverse employment actions—under Title VII, § 1983, and CFEPA—are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (noting that both Title VII and § 1983 discrimination claims are analyzed under the same standards); *Kaytor*, 118 F.3d at 556 (noting that both Title VII and CFEPA discrimination claims are analyzed similarly). A plaintiff must establish a *prima facie* case; the employer may then come forward with a legitimate, non-discriminatory reason for the termination; the plaintiff then has an opportunity to produce evidence and carry the burden of persuasion that the proffered reason is a pretext and that the real reason for the adverse action was the plaintiff's membership in a protected class. *See Vivenzio*, 611 F.3d at 106.

#### A.

Under the *McDonnell Douglas* framework, a plaintiff can establish a *prima facie* case of discrimination by showing that: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (quotation marks omitted). A plaintiff's burden in establishing a *prima facie* case is *de minimis*. *See id.*

The parties agree that Mr. Piela is a member of a protected class and that he was qualified for his position; they dispute whether he suffered an adverse employment action and whether he

has stated evidence giving rise to an inference of discrimination.

1.

For the purposes of a discrimination claim, an adverse employment action is "a materially significant disadvantage with respect to the terms of [a plaintiff's] employment." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Courts must assess each situation in light of the totality of the circumstances, but there must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity." *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 506 (S.D.N.Y. 2010) (quotation marks omitted).

The parties agree that, during his time at the Manson Youth Institution, Warden Whidden did not discipline Mr. Piela and did not issue him any formal counseling letters. The parties also agree that the temporary reassignment to the Security Division, which Mr. Piela alleges Warden Whidden prevented, was not a promotional opportunity. Mr. Piela does not claim that the allegedly late evaluation prevented his promotion to captain, and Mr. Piela acknowledges that administrative regulations and policies prevented him from conducting a training while subject to pending arrests or open investigations. As a result, the only two incidents which might constitute adverse employment actions are the extended excessive force investigation and DoC's decision not to offer Mr. Piela the Training Lieutenant position.

Mr. Piela believes that the excessive force investigation should have been closed on or around April 7 or 8, 2008, when Warden Whidden received a report exonerating him. As a result of the open investigation, Mr. Piela was suspended from CERT. Although he would have been

11

eventually suspended from CERT based on his pending automobile-related arrest, it appears that Mr. Piela's suspension from April 7, 2008 through May 28, 2008 was due entirely to the pending excessive force investigation. Being the subject of an investigation where there is no resulting discipline and the charges are unsubstantiated is not, standing alone, an adverse employment action. *See Rider v. Town of Farmington*, 162 F. Supp. 2d 45, 52-53 (D. Conn. 2001). If, however, as Mr. Piela alleges, that investigation was kept open improperly and his suspension from CERT was therefore extended improperly, Mr. Piela was deprived of a position—and overtime pay—as a result of the unjustified extension. Additionally, the fact that Mr. Piela did not receive the Training Lieutenant position also constitutes an adverse employment action for the purpose of establishing a *prima facie* case.

2.

Recalling that plaintiff's burden at the *prima facie* stage is *de minimus* and evaluating the record in the light most favorable to Mr. Piela, the Court assumes without deciding that he has established an inference of discrimination by alleging that the excessive force investigation should have been closed as of April 7 or 8, 2008 and by demonstrating that Lieutenants Feital and Lauray were offered a position for which he was qualified.

B.

If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the adverse action. *See McDonnell Douglas*, 411 U.S. at 802. Defendants' burden is one of production, not persuasion, and "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

Defendants have proffered legitimate, non-discriminatory reasons for the alleged adverse employment actions. First, there is no formal DoC policy for when an investigation must be

closed, so Warden Whidden was not obligated to close the investigation against Mr. Piela immediately after receiving the April 2008 report. Second, based on the January 2008 interviews, Lieutenants Feital and Lauray were the panel's first and second choices for the Training Lieutenant position, and Mr. Piela was not selected because he did not do well in his interview.

C.

If the defendant offers legitimate business reasons for its actions, the plaintiff must demonstrate that the defendant's articulated justification is merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804. Such pretext may be demonstrated either by reliance on the evidence comprising the *prima facie* case or by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," *Polito v. TriWire Eng'g Solution, Inc.*, 699 F. Supp. 2d 480, 492 (E.D.N.Y. 2010) (quotation marks omitted), and a plaintiff may use "direct, statistical or circumstantial evidence," *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994). Evidence of pretext alone will not be sufficient; the plaintiff must show that the employer's explanation is mere pretext for an impermissible discriminatory motive. *See McDonnell Douglas*, 411 U.S. at 804-05.

The record before the Court leaves many questions unanswered. First, it is unclear why the excessive force investigation against Mr. Piela—which resulted in his suspension from CERT—was kept open for months after Warden Whidden received a report apparently exonerating him, especially as there is no evidence that anything else was done with regard to the investigation after the filing of the April report. Second, with regard to the Training Lieutenant

position, the most salient fact is the dearth of evidence. There are no notes of the panel's discussions, there is no evidence of the panel's ranking of the candidates, there are no performance evaluations, and there is no evidence—other than Mr. Piela's deposition testimony—regarding the candidates' respective training histories. The Court is asked to evaluate Mr. Piela's claim based only on Mr. Piela's allegations and Director Sawicki's competing explanation.

Nonetheless, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Lipton*, 71 F.3d at 469 (quotation marks omitted). As Mr. Piela's "evidence" consists solely of unsupported allegations, the Court finds that he has failed to carry his burden of demonstrating that Defendants' proffered reasons are pretextual.

Furthermore, even if Mr. Piela had sufficient evidence to create a question of fact as to whether Defendants' reasons were pretextual, this would not be enough for him to survive the motion for summary judgment; Mr. Piela would also have to demonstrate that the pretext masks unlawful discrimination. While the *McDonnell Douglas* burden-shifting framework excuses a plaintiff from demonstrating that any adverse employment actions were due to unlawful discrimination at the *prima facie* stage, the plaintiff does not escape this ultimate obligation. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ("[D]iscrimination cases differ from many areas of law in that under the *McDonnell Douglas* burden-shifting framework a plaintiff's satisfaction of the minimal requirements of the prima facie case does not necessarily mean, even if the elements of the prima facie case go unchallenged, that plaintiff will ultimately have sufficient evidence to support a verdict on each element that plaintiff ultimately

must prove to win the case."). As the Second Circuit has noted, "discrimination does not lurk behind every inaccurate statement." *Id.* Instead, "[i]ndividual decision-makers may intentionally dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Id.* In other words, just because a proffered reason is possibly pretextual does not mean that the true motive was illegal. *See id.* at 1338. Here, Mr. Piela does not offer sufficient evidence for a reasonable juror to conclude that Defendants' actions were motivated by his sex.

First, in support of his claim that Warden Whidden's justification for keeping the excessive force investigation open was pretext for discriminatory animus, Mr. Piela maintains that Warden Whidden did not contact CERT to inform them of pending investigations against Lieutenant Feital. However, there is no evidence as to when an investigation against Lieutenant Feital commenced. Both parties agree that on October 1, 2008 Lieutenant Fietel was suspended from CERT because she was involved in a pending Security Division investigation and that on October 31, 2008 Warden Whidden issued Lieutenant Feitel a letter of formal counseling for failure to follow proper procedures when she gained access to a confidential videotape. While the Court must credit a plaintiff's deposition testimony at the summary judgment stage, *see Kaytor*, 609 F.3d at 549, 555, and interpret all facts in Mr. Piela's favor, Mr. Piela's bare allegations regarding Warden Whidden's alleged failure to report Lieutenant Feital is not sufficient to convince a reasonable juror that Warden Whidden was motivated by discriminatory animus. *See Lipton*, 71 F.3d at 469.

Second, Mr. Piela argues that, despite being the stronger candidate due to his extensive training experience, he was not selected for the Training Lieutenant position because of his sex.

However, as Mr. Piela does not appear to allege that Director Sawicki or the panel was motivated by a discriminatory bias—indeed, he states that he believed that Director Sawicki intended to hire him prior to speaking with Warden Whidden—the fact that the panel allegedly offered the position to less experienced women is irrelevant. Instead, the important issue is Warden Whidden's motivation for allegedly sabotaging Mr. Piela's application. In other words, assuming for the present that the panel would have offered the position to Mr. Piela but for Warden Whidden's actions, Mr. Piela must demonstrate that she was motivated by unlawful discriminatory bias rather than sheer personal hostility or an interest in promoting another.

Mr. Piela's admissible circumstantial evidence on this point is far from conclusive. The fact that Warden Whidden regularly called Mr. Piela "young man," even though he claims to have expressed his dislike for that moniker, is not enough to create a question of fact as to whether her actions were motivated by discriminatory animus. Although an inoffensive term may evidence discriminatory bias, *see Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class."), Mr. Piela stated at his deposition that he never heard Warden Whidden call others "young man," despite the fact that there were many other men under her supervision and despite the fact that she stated it was part of her speech pattern. Implicit in these facts is that, insofar as the moniker was intended to be harassing, Warden Whidden targeted Mr. Piela based on some personal hostility, rather than discriminatory animus. Similarly, Warden Whidden's dislike for Mr. Piela's beard and tolerance for Lieutenant Feital's tongue ring would also not convince a reasonable juror that Warden Whidden's later actions were motivated by impermissible bias.

Mr. Piela's other general allegations of harassment and discrimination offer only minimal support for his claim that Defendants' reasons are pretext, much less pretext for discrimination. First, the fact that Warden Whidden turned in Mr. Piela's evaluation later than she turned in those for women hardly supports an inference that she intended to discriminate against him, especially as she turned in a finalized version the same day she received a draft from Mr. Piela's immediate supervisor—after marking Mr. Piela up in one of the categories. Second, when Director Lajoie called Warden Whidden to discuss the possibility of temporarily reassigning Mr. Piela, Warden Whidden accurately informed the director that Mr. Piela had been arrested and had a criminal case pending. The fact that Director Lajoie subsequently decided not to temporarily reassign Mr. Piela to the Security Division does not support an inference either that Warden Whidden or the DoC discriminated against Mr. Piela based on his sex. Third, while Mr. Piela may have complained about Warden Whidden to Mr. Strange, and while he may have been pressured not to file an internal complaint, there is no evidence that his complaint was that he was the victim *of sex-based discrimination*. Rather, the focus of the meeting seems to have been whether Warden Whidden had it out for him as an individual. Mr. Piela describes the meeting as about whether she had called Mr. Piela "a fucking piece of shit liar" and had "systematically harassed [him] for months." Pl.'s Resp. [doc. # 46-4] at 88 (Piela Dep.).

Defendants' proffered reasons may be pretextual, but there is little evidence that they are pretext for illegal discrimination. After considering the admissible facts in the record individually and in totality, a reasonable juror could not conclude that the adverse employment actions—the extended excessive force investigation and the decision to offer the Training Lieutenant position to others—were based on Mr. Piela's sex. *See Parker v. Sony Pictures Entm't*, 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves

17

for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986))); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### IV.

The Court turns next to Mr. Piela's claims of harassment and a hostile work environment.[2] As before, Mr. Piela's claims under Title VII, § 1983, and CFEPA are all analyzed under the same standard. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (noting that the distinction between Title VII and § 1983 hostile work environment claims is that the latter may be brought against individuals); *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("[Connecticut state courts] look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.").

A plaintiff can establish a hostile work environment claim by showing "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his or] her working environment."

---

[2] Defendants argue that, because Mr. Piela's CHRO complaint alleged only harassment, he is now procedurally barred from bringing a hostile work environment claim. The Court finds this argument odd, and ineffective, as "to prevail on *a hostile work environment claim*, a plaintiff must first show that the *harassment* was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (emphasis added) (quotation marks omitted); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (noting that, in the Title VII context, a plaintiff may only raise in district court "those claims that either were included in or are reasonably related to the allegations contained in [his] EEOC charge." (quotation marks omitted)).

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quotation marks omitted). Such conduct must constitute harassment both objectively and subjectively. *See Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001). "Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold*, 366 F.3d at 150. Demonstrating only that there was rudeness, personality conflicts, or incivility for any reason other than prohibited discrimination will not support a hostile work environment claim; rather, such actions must be based on the plaintiff's membership in a protected class. *See, e.g.*, *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth a general civility code for the American workplace." (quotation marks omitted)).

Because Mr. Piela does not describe any one single act that was so egregious as to be extraordinarily severe, he must instead state a hostile work environment claim that "is composed of a series of separate acts that collectively constitute 'one unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold*, 366 F.3d at 150; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998). An evaluation of the conduct is based on the totality of the circumstances, including the conduct's frequency, severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's work performance. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004). The Second Circuit has also noted that "[f]or . . . comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of [sex-based] enmity, . . . there must be a steady barrage of opprobrious

[sex-based] comments." *Schwapp*, 118 F.3d at 110 (quotation marks and citations omitted).

In support of his hostile work environment claim, Mr. Piela relies on the same allegations that formed the foundation of his discrimination claim. However, none of his allegations demonstrate that he was subjected to frequent, severe, physically threatening or humiliating comments or incidents based on his sex. *See Harris*, 510 U.S. at 23. Nor is there evidence that any of the alleged incidents unreasonably interfered with his work performance. *See id.* A reasonable juror could not conclude from the record before the Court that Mr. Piela experienced discrimination based on his sex, much less continuous and concerted harassment that resulted in a hostile work environment due to his sex.

## V.

As Mr. Piela has failed to introduce evidence into the record supporting his discrimination, harassment, and hostile work environment claims, the Court need not address parties' other arguments before GRANTING Defendants' Motion for Summary Judgment [doc. # 43]. **The Clerk is ordered to enter judgment for the Defendants and close the case.**

IT IS SO ORDERED.

_____
Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: April 26, 2012.